IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

GILBERT RAEL,                                )
                                             )
              Plaintiff,                     )              8:07CV432
                                             )
       v.                                    )
                                             )
SOCIAL SECURITY ADMINISTRATION,              )         MEMORANDUM AND ORDER ON
Michael J. Astrue, Commissioner Of Social    )         REVIEW OF THE FINAL DECISION OF
Security Administration,                      )         THE COMMISSIONER OF THE SOCIAL
                                             )          SECURITY ADMINISTRATION
              Defendant.                     )
                                             )

        Now before me is Plaintiff Gilbert Rael's complaint, filing 1, which is brought pursuant

to 42 U.S.C. § 405(g).  The plaintiff seeks a review of the Commissioner of the Social Security

Administration's decision to deny the plaintiff's applications for disability insurance benefits

under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq.  The defendant

has filed an answer to the complaint and a transcript of the administrative record.  (See filings 6-

7.)  In addition, the parties have filed briefs in support of their respective positions.  (See Pl.'s

Br., filing 12; Def.'s Br., filing 18; Pl.'s Reply Br., filing 19.)  I have carefully reviewed these

materials, and I find that the case must be remanded for further proceedings.


                                    I.    BACKGROUND

        The plaintiff filed an application for disability insurance benefits on September 9, 2004.

(See Transcript of Social Security Proceedings (hereinafter "Tr.") at 45.)  After the application

was denied on initial review, (see id. at 45, 47-50), and on reconsideration, (see id. at 43, 51, 53-

56), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (id. at 39).  This

hearing was held on September 26, 2006, (see id. at 521), and, in a decision dated February 1,

2007, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits, (see

id. at 17-29).  In reaching this conclusion, the ALJ made the following findings:

1

1.     The Claimant met the special earnings requirements under Title II of the Social Security Act, as amended, on September 3, 2004, the date he stated he became unable to work, and continues to meet them through at least December 31, 2008.

2.     The Claimant has not performed substantial and gainful work activity since September 3, 2004.  He has received unemployment benefits and disability benefits from the Veterans Administration.

3.     The record establishes that the Claimant has the following medically determinable impairments which have imposed more than slight limitations upon his ability to function: osteoarthritis of the left knee, status post knee replacement surgery, a history of rheumatoid arthritis since 1986 and a mood disorder secondary to his physical condition.

4.     His medically determinable impairments, either singly or collectively, have not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4.  Furthermore, while such impairments have imposed limitations upon his ability to perform basic work-related functions the Claimant would be able to lift and carry up to 10 pounds and could sit for up to 6 hours in an 8 hour workday with normal breaks and he could be on his feet standing and walking for no more than 2 hours.  He cannot perform work on his knees and should avoid crawling, crouching and kneeling.  He needs to avoid ladders, ropes, scaffolds, dangerous equipment, vibrating equipment, wetness and extreme cold and heat.  He should avoid overhead reaching with the right shoulder.  The work would need to be unskilled and would require that he only handle svp 1-2 routine, repetitive work not requiring extended concentration and only brief, superficial social interaction.

5.     As such, the Claimant is unable to perform his past relevant work as a car salesman.  Notwithstanding the exertional and non-exertional limitations

2

resulting from his medically determinable impairments, the Claimant possesses the residual functional capacity for other work that exists in the regional and national economies in significant numbers.

6.      The Claimant's testimony, insofar as it attempted to establish total disability, was not generally credible in view of the criteria set forth under 20 CFR 404.1529, Social Security Ruling 96-7p, and Polaski v. Heckler, supra.

7.      Accordingly, the Claimant is not disabled, as that term is defined under the Social Security Act, as amended.

8.      The Claimant is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act, as amended.

(Tr. at 27-28.)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See Tr. at 11-12.) This request was denied, (see id. at 5-7), and therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On November 9, 2007, the plaintiff filed the instant action. (See Compl., filing 1.) The plaintiff asks that the court "overrule Defendant's prior decisions" and "find that Plaintiff is totally disabled and eligible for all the Social Security benefits claimed for the past, present, and future . . . . [,] for his reasonable attorney fees[,] and for such other and further relief or judgment as the Court may deem just and equitable." (See id. at 2.)

## II.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)); see also Richardson v. Perales,

3

402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The decision should not be reversed "merely because substantial evidence would have supported an opposite conclusion." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995) (citation omitted). However, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984). See also Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) ("To determine whether existing evidence is substantial, 'we must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it.'" (quoting Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993))).

I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision. See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a). Step one requires the ALJ to determine whether the claimant is currently engaged in any substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b). Step two requires the ALJ to determine whether the claimant has an impairment or a combination of impairments that significantly limits his ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of

4

judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c). Step three requires the ALJ to compare the claimant's impairment or combination of impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a). Step four requires the ALJ to consider the claimant's residual functional capacity[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f). Otherwise, the analysis proceeds to step five. At step five, the ALJ must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(a)(4)(v).

"In order to qualify for disability benefits, a claimant bears the burden of proving that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death." Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). At step five of the sequential analysis described above, however, the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity to do "some job that exists in the national economy." Id. See also Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).

In this case, the ALJ reached step five of the sequential analysis and concluded that the

---

[1]"'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

plaintiff was not disabled.  (See Tr. at 28 ¶¶ 5, 7.)

### III.    SUMMARY OF THE RECORD

The plaintiff was born in March 1960, and he was 46 years of age at the time of the administrative hearing.  (See Tr. at 18.)  He graduated from high school and completed some vocational training.  (See id. at 526.)  From June 4, 1982, to August 31, 1992, the plaintiff served in the United States Air Force.  (See id. at 142.)  Much of the record consists of documents from the Veteran Affairs Medical Center (VAMC), dated 2001 through 2006.  These documents will be summarized below.[2]

On August 9, 2001, the plaintiff was examined by Dr. Claudia Greene-Harrington.  (See Tr. at 261-264.)  Dr. Greene-Harrington's notes indicate that the plaintiff came in "for follow up regarding his rheumatoid arthritis."  (Id. at 261.)  The plaintiff complained of left hip pain and a stiffness that lasts for approximately one hour after he "first gets up in the morning."  (Id.)  It was noted that the plaintiff worked as a car salesman, and that "when he is walking around, he sometimes gets tired and has a little bit of discomfort."  (Id.)  "When he sits down to rest, he then gets stiff and then subsequently goes to the same routine again moving to get rid of the stiffness, but it is painful."  (Id.)  The plaintiff also had "an essential tremor" that was being treated with propranolol, (id.), and "a history of environmental allergies," (id. at 263).  The plaintiff was assessed with "Left hip pain in a patient with rheumatoid arthritis," and a plan was made to "get x-rays of the left hip and pelvis" while treating pain with Percocet.  (Id. at 262.)  The doctor also expressed concern that the plaintiff might have emotional difficulty "dealing with the stress of having chronic illness."  (Id.)

On February 9, 2002, Dr. Joshua Urban performed a "compensation and pension examination" of the plaintiff.  (Tr. at 251.)  The plaintiff was assessed with "[r]heumatoid arthritis-significantly affecting bilateral hands, feet, ankles, and knees, and left hip," and "[m]oderate to severe degenerative joint disease, left knee."  (Id. at 253.)  Dr. Urban noted that although "the patient's symptoms were relatively mild" at the time of the examination, which

---

[2]The plaintiff has provided a helpful chart chronicling his treatment history.  (See filing 12, Attach. 1.)

was conducted at midday, the plaintiff's symptoms were reportedly "worse in the morning upon arising."  (Id.)  Dr. Urban also noted,

> With respect to the other issue at hand today, whether or not he could be employed at another job, it is difficult for this examiner to answer this question. The objective evidence obtained today seems to conflict with any difficulty in function except for his left hip and left knee exam.  Again the time of day of this examination is probably not indicative of how bad he actually hurts.  From the patient's own history however, it is apparent that either prolonged sitting or prolonged standing is not ideal for this patient.  Therefore it is the opinion of this examiner that vocational rehab consult or similar expertise should be sought in determining whether or not this patient can be gainfully employed by altering his activity between sitting and standing.  It is very possible that he indeed cannot tolerate a job for a significant amount of time even if it varies between sitting and standing.

(Id. at 253-54.)

On May 8, 2002, the plaintiff appeared for a follow up examination by Dr. Greene-Harrington.  (Tr. at 248-49.)  The plaintiff complained of "a lot of pain from his joints," and he inquired whether his reaction to his pain and his lack of joy in working and caring for his family amounted to depression.  (Id. at 249.)  Dr. Greene-Harrington reported that, "instead of using an antidepressant, we opted today to try to maximize pain control."  (Id.)  Adjustments were made to the plaintiff's medications.  (Id.)

The plaintiff appeared for another follow up examination by Dr. Greene-Harrington on September 25, 2002.  (Tr. at 240-41.)  Dr. Greene-Harrington noted that the plaintiff was "under a lot of stress with his job" because of the limitations imposed by his stiffness and pain.  (Id. at 241.)  The plaintiff was assessed with, inter alia, "[t]remor in the hands" and "[r]heumatoid arthritis."  (Id.)

On January 7, 2003, the plaintiff was examined by Dr. Jay Kenik of the VAMC Rheumatology Clinic.  (Tr. at 232-33.)  The plaintiff complained of pain in his shoulders, hips, and knees, with his left knee "more bothersome" than his right.  (Id. at 232.)  No changes were made to the plaintiff's treatment regimen, and the plaintiff was instructed to return for a follow up in approximately six months.  (Id. at 233.)

On February 20, 2003, the plaintiff was examined once again by Dr. Greene-Harrington. (Tr. at 230-32.)  Dr. Greene-Harrington noted that the plaintiff was "[h]aving a lot, a lot of pain"

due to his rheumatoid arthritis.  (Id. at 231.)  A new medication, tramadol, was prescribed to address the pain.  (Id.)  Dr. Greene-Harrington also noted that the plaintiff "tends to appear to always have malaise and looks sad," and "admits that there are times that he feels such because he is in much pain."  (Id.)  In addition, the plaintiff was suffering from allergic reactions and hives.  (Id.)

On May 23, 2003, Dr. Greene-Harrington examined the plaintiff and expressed concern "that [he] is having prolonged problems with multiple joint pain causing him to feel fatigued and making it difficult for him to do his job per his report."  (Tr. at 223.)  She also noted that the plaintiff was scheduled for a rheumatology appointment on July 8, and she hoped to communicate with rheumatology about a plan of action for the plaintiff.  (Id. at 224.)  On July 8, 2003, the plaintiff was examined by Dr. John Hurley of the Rheumatology Clinic.  (Id. at 221.)  The plaintiff complained of "morning stiffness that lasts one to two hours and some difficulty during the day."  (Id.)  Dr. Hurley noted "some tender spot compression of the forefeet bilaterally" and "some swelling in several if the small joints in the hands," but found that the plaintiff "can make a complete fist," and "there are no nodules."  (Id.)  Dr. Hurley also noted that "[t]he rest of the joints reveal no active disease."  (Id.)  An additional medication was added to the plaintiff's treatment regimen.  (See id.)

On July 30, 2003, the plaintiff was examined by Jeffrey Beste, PAC.  (Tr. at 218-19.)  The plaintiff reported that his shoulders had "definitely worsened over the past six months," and were causing him daily, persistent pain.  (Id. at 218.)  He also complained of ankle and wrist pain, and he claimed that his ailments caused him "trouble getting to sleep at times."  (Id.)  Beste diagnosed the plaintiff with "[r]heumatoid arthritis of bilateral shoulders, right knee, right ankle, and right wrist."  (Id. at 219.)

On August 6, 2003, plaintiff was seen by Dr. Ernest Haffke "for psychiatric evaluation to assess adjustment disorder with depressed mood."  (Tr. at 216.)  Dr. Haffke's progress note states that the plaintiff "was seen for original compensation and pension evaluation [on] 12/18/02," and that "[a]t that time diagnosis was adjustment disorder with depressed mood secondary to rheumatoid arthritis and a global assessment of functioning of 60 was assessed."  (Id.)  The note continues,

Since that time, the patient has continued to remain in active treatment at Omaha VA Medical Center for his rheumatoid arthritis.  On 07/08/03 he became tearful after his clinic appointment and his primary care physician started citalopram for depression.  The progress notes also indicate that his rheumatoid arthritis had increased and methotrexate was started to treat the condition.

Veteran continues to have feelings of worthlessness and sad mood.  He has increased fatigue.  He has difficulty initiating sleep.  He is not suicidal.  His weight has been relatively stable . . . .  He has shown constriction in his interests and has continued to have guilt feelings.  He has decreased energy.

He feels stressed because of their financial situation and his ability to work.  He currently works in car sales.  He feels that he is not as competitive as other individuals because for one thing he cannot move as fast to get [to] the sales floor when people come.  He also has a decreased energy to continue the job.  Since he cannot compete for more commissions, he seldom makes more than his minimum salaried income.

He is currently rated at 90% service connected for disabilities and is aware of the amount of that income.  He reports they are getting by financially. . . .  He works irregular hours and often spends 50-60 hours a week in the dealership.  This situation has been so frustrating that he feels his depression has increased and his primary care physician started the antidepressant.  Veteran reports that his mood has been helped some by the antidepressant.

We discuss being seen in the Mental Health Clinic.  He has considered that and his primary care physician has offered to refer him, but he will come out further behind because of the time he would have to take off from work.  At this point, he is concerned if he takes anymore time off he will lose his job.

(Tr. at 216-17.)  Dr. Haffke concluded that the plaintiff was suffering from "[a]djustment disorder with depressed mood," "[r]heumatoid arthritis," and "[m]oderate to severe stressors, mainly of financial and physical [sic]," and reported that the plaintiff's [c]urrent global assessment of functioning is 53, indicating moderate ongoing symptomatology."  (Tr. at 217.)

On October 8, 2003, the plaintiff was seen again by Jeffrey Beste.  (Tr. at 214-15.)  The plaintiff complained of problems in his left and right hands, with pain "every day, mostly in the morning" and after performing "a lot of writing at work."  (Tr. at 215.)  Beste diagnosed "[r]heumatoid arthritis in bilateral wrists," "[r]heumatoid arthritis, bilateral metacarpal phalangeals two through five," and "[p]osttraumatic degenerative joint disease in [the distal

9

interphalangeal joint] left fifth digit with limited range of motion."  (Id.)  In a separate progress note, Beste opined that the plaintiff's rheumatism also affected his left ankle.  (Id. at 214.)

On November 12, 2003, the Department of Veteran's Affairs issued a rating decision assigning "a permanent 100% disability evaluation" for the plaintiff's "service connected disability/disabilities."  (Tr. at 138; see also id. at 134.)  More specifically, the Department assigned 10% disability for "[r]heumatoid arthritis, right knee," 10% disability for "[r]heumatoid arthritis, right wrist," 20% disability for "[r]heumatoid arthritis, right shoulder," 20% disability for "[r]heumatoid arthritis, left shoulder," and 50% disability for "[a]djustment disorder with depressed mood-secondary to Rheumatoid arthritis."  (Id. at 138.)[3]  The decision also states,

> Evaluation of the following conditions for increased compensation is deferred pending VA examination:
>
> Surgical repair, right little finger, radial collateral ligament deficiency, rheumatoid arthritis of small joints, right hand
> Rheumatoid arthritis, left wrist, S/P undisplaced fracture, left distal radius
> Rheumatoid arthritis, left foot
> Rheumatoid arthritis of the small joints of the left hand, fracture, left little finger
> Rheumatoid arthritis of the left hip
>
> Entitlement to compensation for rheumatoid arthritis of the left ankle is deferred pending receipt of additional information from the VA Medical Center.

(Tr. at 139.)

A progress note indicates that the plaintiff was seen in the Rheumatology Clinic on January 13, 2004.  (Tr. at 204.)  The note states that the plaintiff was experiencing "significant improvement" in his rheumatoid arthritis, (id. at 204), but he was also suffering from pain in his left knee, (id. at 206).  The knee pain was "severely limiting him in terms of his work" because his position as a car salesman required him "to be on his feet all day."  (Id. at 206.)  The plaintiff was asked to return in one month to review x-rays of the knee.  (See id.)

The plaintiff was examined once again on February 10, 2004.  (Tr. at 202.)  The aforementioned x-rays of the left knee revealed "significant degenerative changes."  (Id. at 203.)

_____

[3]The decision states, "We do not add the individual percentages of each condition to determine your combined rating [of 100%].  We use a combined rating table that considers the effect from the most serious to the least serious conditions."  (Tr. at 139.)

10

Physical examination revealed "no synovitis in the elbows, wrists, hands, knees, ankles, or feet," "significant tenderness around the medial aspect of the left knee," and "significant patellofemoral crepitus of the left knee," but no evidence of instability, meniscal tears, or effusion of the knee. (Id.)  The progress note includes the following impressions:

1. Prior history of rheumatoid arthritis.  This history is very atypical.  There is certainly some suggestion based on his prior surgical report of them having found synovitis.  However, currently I see no evidence of longstanding synovitis in the joints, his rheumatoid factor has been negative, and his acute phase reactives are all normal.  However, he continues to have substantial morning stiffness.  I think the underlying diagnosis of rheumatoid arthritis is somewhat questionable, although he has objectively responded to increasing doses of methotrexate.

2. Degenerative joint disease of the knee. . . .  We did discuss therapy with him.  He is not interested in interarticular injections at the present time, although he may consider that in the future.

(Id. at 203-04.)

On July 4, 2004, the plaintiff dislocated his shoulder while playing volleyball.  (Tr. at 151-52.)  The emergency report indicates that he slipped and fell on his right shoulder while running on wet grass.  (Id. at 151)  The shoulder was "reduced," and the plaintiff was discharged with a sling and instructions to take Vicodin for pain.  (Id. at 152.)  The plaintiff was also instructed to follow up with his primary care physician.  (Id.)  On July 7, 2004, the plaintiff was examined by Dr. Greene-Harrington, who noted that a plan would be made for physical therapy of the shoulder.  (Tr. at 198.)   Records indicate that the plaintiff participated in physical therapy from July 14, 2004, through August 24, 2004.  (Tr. at 188-97.)

On August 3, 2004, the plaintiff appeared for a routine follow up examination by Dr. Hurley.  (Tr. at 193.)  The plaintiff stated that he was "doing quite well," except for left knee pain.  (Id.)  Dr. Hurley diagnosed "[r]heumatoid disease, stable," and "[p]ossible early degenerative disease, left knee."  (Id. at 194.)  The doctor "talked about local steroid injection" with the plaintiff, but the plaintiff maintained that he was "not interested . . . at this time."  (Id.)

On October 18, 2004, the plaintiff was seen for a follow up regarding his tremor.  (Tr. at 186-88.)  The plaintiff reported that his tremor was improving, but that he had been suffering from chronic headaches for two to three years.  (Id. at 187.)  Adjustments were made to the

plaintiff's medications, though he was given no medication for his tremor.  (Id. at 188.)

Dr. Jane Warren performed a psychological examination of the plaintiff on November 2, 2004.  (Tr. at 164-67.)  According to her report, the plaintiff "stated that he was somewhat surprised that he was being seen by a psychologist, as he felt his disability is physical."  (Id. at 164.)  The plaintiff also stated that he was fired from his job on September 3, 2004, due to "lack of productivity."  (Id. at 164.)  Dr. Warren concluded that there did "not appear to be any restriction of activities of daily living or difficulties in maintaining social functioning," although the plaintiff did "have some mild depressive and anxiety symptoms that appear to be related to psychosocial stressors, such as the recent loss of his job."  (Id. at 166.)  Her diagnosis was, on Axis I, "Adjustment disorder with mixed anxious and depressive mood"; on Axis II, "None"; on Axis III, "Rheumatoid arthritis, Headaches"; on Axis IV, "Finances"; and on Axis V, "Current GAF 70, highest GAF 70."  (Id.)

On November 29, 2004, a Dr. Grossman completed a residual functional capacity assessment of the plaintiff based on a review of the medical record.  (See Tr. at 123-130.)  Dr. Grossman opined that the plaintiff was capable of occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds, standing and/or walking with normal breaks for a total of about six hours in an eight-hour workday, and sitting with normal breaks for a total of about six hours in an eight-hour workday.  (Id. at 124.)

The plaintiff appeared for a follow up examination by Dr. Greene-Harrington on December 10, 2004.  (Tr. at 183-85.)  Dr. Greene-Harrington noted that the plaintiff was confronting "a lot of psychosocial stressors"; specifically, he was facing financial stress, and his "wife . . . threatened to leave him because of financial issues."  (Id. at 183, 185.)

On December 28, 2004, the plaintiff was seen by Barbara Lutey, APRN.  (Tr. at 174-76.)  Her note states, in part, as follows.

> The patient has rheumatoid arthritis and came to the realization that he is going to have to live with that.  He hates the idea of being a cripple.  He has young children, and he thinks about what he will be unable to do with them.  His mood is depressed and sad.  He feels useless and worthless.  His sleep is five to six hours at night interrupted with pain.  He is tired and achy during the day.  Interests are constricted.  He feels guilty.  Energy is diminished. . . .

(Id. at 174.)  Her diagnosis was, on Axis I, "Mood disorder secondary to medical condition"; on

Axis II, "Deferred"; on Axis III, "Rheumatoid arthritis, essential tremor, chronic tension headaches, degenerative joint disease of the left knee"; on Axis IV, "Moderate.  After he lost his job his wife threatened . . . to leave him [if she had to work], financial difficulties"; and on Axis V, "A Global Assessment of Functioning of 55."  (Id. at 176.)  Lutey indicated that the plaintiff's treatment plan would include supportive therapy, a referral to a chronic illness group, relaxation techniques, and continuing marital therapy.  (Id.)  The long-term goal of the treatment was "to improve adjustment to chronic illness," and the expected duration of treatment was six to twelve months.  (Id.)

On January 18, 2005, the plaintiff visited Dr. Greene-Harrington for "[e]valuation and management of chronic problem(s)."  (Tr. at 182.)  Dr. Greene-Harrington's assessment was "depression and adjustment disorder secondary to RA."  (Id. at 183.)

On February 15, 2005, a Dr. Reed completed a "Residual Functional Capacity Assessment" form stating, "I have reviewed all of the evidence in file, and the RFC of 11/29/04 [by Dr. Grossman] is hereby affirmed as written."  (Tr. at 131.)

The plaintiff was seen again by Barbara Lutey on April 25, 2005.  (Tr. at 172-73.)  The plaintiff reported that he was not working "and as a result is feeling better," though he indicated that physical activity "hurts" and that his "[s]leep is interrupted by pain."  (Id. at 172.)  Her assessment was, on Axis I, "Depression secondary to medical condition"; on Axis III, "Rheumatoid arthritis"; and on Axis V, "GAF 57."  (Id. at 173.)  No Axis II or Axis IV diagnoses were reported.  (Id.)

On September 7, 2005, Dr. Greene-Harrington examined the plaintiff and determined that he was suffering from elbow tendinitis.  (Tr. at 505-507.)  The plaintiff was treated with a neoprene band for his arm and instructed to apply topical agents to the affected area.  (Id. at 507.)

The plaintiff attended a counseling session with Barbara Lutey on September 12, 2005.  (Tr. at 502-04.)  Lutey noted that the plaintiff's mood was "low," his sleep was "poor," and he was suffering "severe headaches 2-3 times a week."  (Id. at 503.)  Her assessment was, on Axis I, "depressive disorder secondary to medical condition"; and on Axis V, "GAF 55."  (Id. at 503-04.)  No Axis II, III or IV diagnoses were reported.  (Id.)  Supportive therapy was planned, and the benefits of vocational rehabilitation were discussed with the plaintiff.  (Id. at 504.)

13

Dr. Scott Menolascino examined the plaintiff in an emergency room on October 3, 2005. (Tr. at 497-99.)  The plaintiff appeared with complaints of left knee pain.  (Id. at 498.)  A left knee sprain was diagnosed, and the plaintiff was instructed to use crutches for two weeks.  (Id.)

On November 30, 2005, the plaintiff was examined by Dr. Greene-Harrington.  (Tr. at 490-92.)  He complained of left knee pain and "point tenderness in hands at several" joints.  (Id. at 491.)  Dr. Greene-Harrington's note indicates that x-rays would be ordered for the plaintiff's knee, and that she was concerned that the plaintiff's hand and wrist pain might be medication-related.  (Id. at 492.)  X-rays of the plaintiff's wrists were normal, but an x-ray of the knee revealed degenerative joint disease.  (Id. at 292-93.)

On January 17, 2006, the plaintiff was examined by Dr. Kenik.  (Tr. at 485-86.)  The plaintiff complained of "multiple joint pains . . . and some pain on the balls of his feet."  (Id. at 485.)  He also complained of "morning stiffness and pain for 1 hour in the a.m. and rates his pain at 6/10."  (Id.)  Changes were made to the plaintiff's medications, and the plaintiff was to return in one month for a follow up.  (Id. at 486.)

Records indicate that the plaintiff attended another counseling session with Barbara Lutey sometime before January 25, 2006.  (Tr. at 484.)  Her diagnostic impression was "[d]epression secondary to medical condition," and "GAF 55."  (Id.)  The plaintiff declined therapy.  (Id.)

On January 30, 2006, the plaintiff appeared in an emergency room with complaints of left hand pain.  (Tr. at 479-80.)  The record states that the plaintiff "was ripping up carpet when [the pain] began, though he [did] not recall any specific event to cause the injury."  (Id. at 480.)  X-rays were taken of the plaintiff's wrist, and the plaintiff was diagnoses with "[l]eft wrist sprain/cellulitis."  (Id.)  Medication and a wrist splint were prescribed, and the plaintiff was "advised to rest his wrist, ice it, and elevate it."  (Id.)

The plaintiff was seen for a follow up exam by Dr. Greene-Harrington on February 6, 2006.  (Tr. at 472-75.)  After examining the plaintiff, Dr. Greene-Harrington concluded that changes should be made to the plaintiff's rheumatoid arthritis treatment regimen and that the medication used to treat his depression should be increased.  (Id. at 474-75.)

On February 8, 2006, the plaintiff appeared in the Rheumatology Clinic for a follow up. (Tr. at 470-71.)  The plaintiff was "not doing well," suffering from "multiple joint problems."

14

(Tr. at 470.)  He also reported "extreme distress and frustration with previous treatment options for his disease."  (Id.)  An MRI of the plaintiff's left knee revealed "1. Advanced medial compartment [degenerative joint disease] with diffuse full thickness cartilage loss and diffusely torn medial meniscus.  2.  No intact fibers of the anterior cruciate ligament consistent with prior injury.  3.  Prior posterior cruciate ligament injury.  4.  Diffuse synovitis."  (Id. at 471.  See also id. at 290-91.)

On February 22, 2006, the plaintiff appeared for a follow up examination by Dr. Greene-Harrington.  (Tr. at 465-68.)  Dr. Greene-Harrington noted that the plaintiff was "able to ambulate but with some difficulty."  (Id. at 467.)  She noted a "point of confusion" regarding the plaintiff's medication regimen, and discussed with the plaintiff "what to do in case of adverse reaction" to medication.  (Id. at 468.)

On April 4, 2006, the plaintiff was seen by Dr. Lynell Klassen at the Rheumatology Clinic.  (Tr. at 455-56.)  Dr. Klassen's note states that the plaintiff had been "placed on a more intensive therapy," and that the plaintiff reported "that he has gotten significantly improved"–"about 50% better."  (Id. at 455.)  Nevertheless, there was still "clear-cut evidence of synovial proliferation and disease activity."  (Id. at 456.)  The plaintiff was advised to continue with his current medication and return to the clinic in six weeks.  (Id.)

On May 8, 2006, the plaintiff was seen by Dr. Mostafa Hammoudi for a follow up regarding his essential tremor and chronic tension headache.  (Tr. at 440-42.)  The plaintiff indicated that his tremor was "better than before," "mild," and "not bothering him at all."  (Id. at 440.)  His headache was causing him pain, but seemed manageable.  (Id. at 442.)  No changes were made do the plaintiff's treatment regimen.

On May 16, 2006, the plaintiff was seen again by Barbara Lutey.  (Tr. at 424-25.)  Lutey noted that the plaintiff's "mood ha[d] improved" with an increase in medication and the scheduling of a total knee replacement.  (Id. at 424.)  She assessed "[d]epression secondary to medical condition" with a GAF of 62.  (Id. at 425.)

The plaintiff was seen by Dr. Charles Rosipal on March 17, 2006, for an orthopedic consultation.  (Tr. at 462-63.)  The plaintiff indicated that, due to continued problems with his knee, he desired a total knee arthroplasty.  (Id. at 462.)  Dr. Rosipal concluded that the plaintiff

15

was suffering from "[l]eft gonarthrosis." (Id. at 463.)  The doctor reviewed the risks and benefits of total knee arthroplasty with the plaintiff and stated that he would present the plaintiff's case to the orthopedic staff.  (Id.)  He also stated that he would order physical therapy for the plaintiff in anticipation of the procedure.  (Id.)  The record indicates that the plaintiff completed thirteen physical therapy sessions between March 27, 2006, and May 24, 2006.  (Id. at 421.)

A left total knee arthroplasty was performed on June 1, 2006.  (Tr. at 294.)  Records indicated that the procedure went "well," and the plaintiff did "very well" over the next four days.  (Id.)  He was discharged home on or about June 5, 2006.  (Id.)

On June 20, 2006, the plaintiff was seen by Dr. Amy Cannella in the Rheumatology Clinic.  (Tr. at 323-25.)  The plaintiff reported that he was "[d]oing well," and his knee was "doing okay."  (Id.)  On this same date, x-rays were taken of the plaintiff's hands and feet.  (Id. at 282-83.)  The plaintiff's hands appeared normal, and only "minimal degenerative changes" were found in the "fifth metatarsophalangeal joints" of the plaintiff's feet.  (Id.)  The plaintiff was also given a bone density scan, which revealed "[b]orderline osteopenia of the hips."  (Id. at 286-87.)

The plaintiff attended physical therapy on various dates between June 7, 2006, and August 9, 2006.  (See Tr. at 301-04, 307-08, 311-22, 325-28, 330-35.)

On September 5, 2006, the plaintiff was seen again by Dr. Cannella.  (Tr. at 297-99.)  The plaintiff stated that he was feeling "a little achy," though he felt better than he did during his last visit.  (Id. at 298.)  He also reported morning stiffness of about sixty minutes' duration.  (Id.)  He stated that his left knee was "okay," though Dr. Cannella noted that it was "warm and swollen." (Id. at 298-99.)  Dr. Cannella's impression was "1.  Rheumatoid arthritis - doing well on current regimen . . . 2.  Comorbidities  3. [Bone scan] with early osteopenia."  (Id. at 299.)  The plaintiff was to return to the clinic for a follow up in twelve weeks.  (Id.)

On September 26, 2006, the plaintiff testified in the hearing before the ALJ.  (See Tr. at 521-36.)  He testified that after leaving the military, he worked in car sales for approximately twelve years.  (Id. at 527.)  He said that he was fired from his job at Kia of Omaha on September 3, 2004, for "lack of productivity," and he applied for disability benefits six days later.  (Id. at 528.)  He also collected unemployment benefits and looked for work, but had "no luck."  (Id. at 528-29.)  He received approximately $2600 per month in "VA disability pay," which would not

16

be lost if he went back to work.  (Id. at 529.)  When asked whether he could do a sitting job or a "light exertional job," the plaintiff testified,

> Could I do a sitting job, yes.  But again, I sat even in car sales also regardless of the fact that I still had to get up and move around for so much stiffness from sitting too long.  And if I stood for too long, I would have to sit down and rest.  So it is kind of well, I either can't find a job that I can get up and down and move around sometimes, or it is going to put up with me having to get up and down a lot, or sometimes be excused, or maybe not even show up for work some days.

(Tr. at 531.)  In addition, the plaintiff's representative asked the following questions, and the plaintiff gave the following answers:

> Q       Do you think you could do a job, a job that would allow you to sit or stand, at your option, eight hours a day five days a week on a continual basis?
>
> A       I guess.  If they allowed me to take breaks when needed, sit when needed, and stand when needed.
>
> . . . .
>
> Q       Okay.  Could you sit upright, like in the type of chair you are in now, and do that like a desk job?
>
> A       I still have to get up.  I couldn't sit for all day long or eight hours straight, or not even four hours straight, or nothing like that.
>
> Q       All right.  So when you say you sit, you have been talking about sitting more in a reclining position than sitting upright?
>
> A       Yes.  Correct.

(Tr. at 534-35.)

A Vocational Expert (VE) also testified at the hearing before the ALJ.  (Tr. at 536-43.) The expert testified that if the plaintiff "could do light or sedentary work," and added that "[i]f he needed to alternate sitting and standing," he could perform unskilled sedentary jobs such as "document preparer" and order clerk," or unskilled light jobs such as "storage facility rental clerk."  (Id. at 541-42.)

### IV.   ANALYSIS

The plaintiff argues that the Commissioner's decision must be reversed for three main reasons: 1) the ALJ failed to give proper consideration to evidence indicating that the plaintiff was found to be disabled by the VA; 2) the ALJ failed to develop the record to assess properly the plaintiff's residual functional capacity; and 3) the ALJ "erred by drawing inferences from the medical record and forming a medical opinion to minimize the severity of Rael's arthritis."  (Pl.'s Br., filing 12, at 6.)

### A.   Whether the ALJ Properly Considered the VA's Disability Determination

The plaintiff argues first that the ALJ failed to consider properly the VA's disability finding or to provide reasons for rejecting that finding.  (Pl.'s Br., filing 12, at 7-10.)  I agree.

The regulations governing the Social Security Administration's disability determinations state,

> A decision by . . . any other governmental agency about whether you are disabled . . . is based on its rules and is not our decision about whether you are disabled . . . .  We must make a disability . . . determination based on social security law.  Therefore, a determination made by another agency that you are disabled . . . is not binding on us.

20 C.F.R. § 404.1504.  Nevertheless, another governmental agency's decision that a claimant is disabled is "evidence" that must be considered by the Administration.  See 20 C.F.R. § 1512(b)(5); SSR 06-03p (effective Aug. 9, 2006).  Moreover, "the adjudicator should explain the consideration given to [decisions by other agencies] in the notice of decision for hearing cases."  SSR 06-03p, at *7.

In Morrison v. Apfel, 146 F.3d 625, 627-28 (8th Cir. 1998), the Eighth Circuit determined that the ALJ erred by failing to address a "report by [a] VA doctor that Morrison could not work and was entitled to a government pension."  The court explained,

> It is true that "the ALJ does not have to discuss every piece of evidence presented . . . ."  It is also true that a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits.  We think, however, that the VA finding was important enough to deserve explicit attention.  We agree with other courts that findings of disability by other federal agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision.

18

It may be, as the Commissioner suggests, that the ALJ's failure to address the VA findings constituted an "implicit rejection" of the finding of disability by the VA.  Nonetheless, an extensive physical examination documenting Morrison's medical problems, followed by a finding of a permanent and total disability by another government agency, all of which occupies some thirty pages in the record, merits more than simply an implicit rejection.  If the ALJ was going to reject the VA's finding, reasons should have been given, to enable a reasoned review by the courts.  We are fortified in this conclusion by the fact that the Social Security Administration has given this very instruction to its adjudicators.  A 1992 memorandum from the Social Security Administration's Chief Administrative Law Judge to the Office of Hearings and Appeals field personnel reminded "all ALJs and decision writers that even though another agency's determination that a claimant is disabled is not binding on SSA . . . , the ALJ must evaluate it as any other piece of evidence, and address it in the decision."

Id. at 628 (citations omitted) (emphasis in original).  Although Morrison states that an ALJ should state her reasons for rejecting the VA's disability findings, the Eighth Circuit has since held that an ALJ gives proper consideration to a VA disability determination if she considers and discusses "the underlying medical evidence contained in the VA's Rating Decision."  Pelkey v. Barnhart, 433 F.3d 575 (8th Cir. 2006).  See also Lafferty v. Astrue, 559 F. Supp. 2d 993, 1010 (W.D. Mo. 2008) ("Where an ALJ does not mention another agency's finding of partial disability, there is no error if the ALJ fully considered the evidence underlying that agency's final conclusion regarding disability."); Bergner v. Astrue, No. 8:07cv139, 2008 WL 700296, at *4-5 (D. Neb. March 13, 2008) (holding that the ALJ committed no error when the ALJ clearly considered the evidence underlying the VA's disability determination).

Pelkey was decided before SSR 06-03p became effective, and one might reasonably question whether discussing the evidence underlying the disability decision of another agency–without explaining the consideration given to the decision itself–is fully consistent with the policy interpretation set forth in the Social Security Ruling.  See SSR 06-03p at *7 (stating that the decision of another agency, in addition to the evidence used by that agency to make its decision, "may provide insight into the individual's mental and physical impairment[s]," and that "adjudicator[s] should explain the consideration given to these decisions").  There is no need to resolve this question here, however, because the ALJ's decision in this case is clearly deficient under Pelkey.

The following constitute the ALJ's only references to the VA's disability determination in this case:

> On November 12, 2003, a Rating Decision was issued by the Department of Veterans Affairs assigning a permanent 100% disability evaluation for services connected to [sic] disability/disabilities.  The claimant's disabilities were found to be related to his rheumatiod arthritis and an adjustment disorder with depressed mood-secondary to rheumatoid arthritis.

> . . . .

> It is noteworthy that the Regulatory definitions for a finding of disability differ significantly between the VA and the Social Security Administration.  The Social Security Administration is not bound by the ratings and findings of the VA.

(Tr. at 18, 24.)  This brief discussion of the VA's disability determination might have sufficed if the ALJ had "considered and discussed the underlying medical evidence contained in the VA's Rating Decision."  Pelkey, 433 F.3d at 579-80.  The ALJ failed to do so, however.  The VA's Rating Decision states specifically that it was based on the following evidence:

> [The plaintiff's] statement received July 17, 2003
> Treatment reports, Nebraska-Western-Iowa Healthcare System, from January 7, 2003 through July 16, 2003
> [The plaintiff's] statement received July 28, 2003
> VA examination, Nebraska-Western-Iowa Healthcare System, dated October 8, 2003

(Tr. at 135.)  The ALJ's decision discusses none of these records.  Indeed, the decision cites no records whatsoever from the year 2003–apart from the brief reference to the November 12, 2003, rating decision itself, which has been quoted above.  While it is true that the medical record in this case is based almost entirely on VA documents (and the ALJ's decision is based on a subset of these documents), the ALJ's failure to discuss the records underlying the VA's Rating Decision, coupled with her failure to provide any reasons for rejecting the VA's disability determination, constitutes error.  See Pelkey, 433 F.3d at 579-80; Morrison, 146 F.3d at 628-29.  The case must therefore be remanded.

20

**B.    Whether the ALJ Failed to Develop the Record with Respect to the Plaintiff's RFC, and Whether the ALJ Drew Improper Inferences From the Medical Record**

Although a remand is necessary for the reasons stated above, the plaintiff has raised two additional arguments that merit attention.

First, the plaintiff asserts that the ALJ erred by failing to include the plaintiff's need to alternate between sitting and standing in her RFC assessment and by failing to develop the record to determine the extent to which the plaintiff's "occupational base" was eroded by the need to alternate between sitting and standing.  The record in this case presented the following questions: 1) does the plaintiff need to alternate positions (i.e., should the need to alternate between sitting and standing be included in the plaintiff's RFC)? and 2) if so, how often does the plaintiff need to shift positions?  See Coleman v. Astrue, 498 F.3d 767, 774 (8th Cir. 2007).  In this case, as in Coleman, it seems that the ALJ wrongly answered the first question.  The plaintiff's need to alternate between sitting and standing was noted in the medical record and was raised by the plaintiff during the hearing; even so, the ALJ excluded it from the RFC assessment without explanation.  It seems to me that the ALJ's decision to make this exclusion is not supported by substantial evidence.  Despite the exclusion of this limitation from the RFC assessment, however, the ALJ's decision accurately notes that the Vocational Expert was asked whether "any jobs would be appropriate" if the plaintiff "needed to alternate between sitting and standing." (Tr. at 541; see also id. at 26.)  Yet the ALJ failed to develop the record to determine how often the plaintiff needed to shift between sitting and standing.[4]  Only after the extent to which the plaintiff is required to alternate between sitting and standing has been determined can the limitation be incorporated into the plaintiff's RFC and presented to a Vocational Expert.  See Coleman, 498 F.3d at 775.  Then the Commissioner might accurately assess the plaintiff's ability to perform work other than that which he has done in the past.

---

[4]The plaintiff also submits that the ALJ's decision states–wrongly–that according to the VE, the plaintiff could perform all unskilled sedentary work even if he were required to alternate between sitting and standing.  (Compare Tr. at 541 with id. at 26.)  The plaintiff is correct, and this error should be rectified on remand.

Second, the plaintiff argues that "[t]he ALJ drew inferences from the record and formed a medical opinion by minimizing the severity of Rael's arthritis when she selectively cited medical records that supported her proposition and failed to acknowledge the substantial medical evidence that commented on the severity of Rael's arthritis."  (Pl.'s Reply Br., filing 19, at 4.)  I have carefully considered the specific examples cited in the plaintiff's brief, (see filing 12 at 19-23), and I am not persuaded that the ALJ drew improper inferences, "medical" or otherwise. Nevertheless, for the reasons explained above, the case must be remanded.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated September 16, 2008.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge